**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**
**AT CHATTANOOGA**

| | | |
|---|---|---|
| KRISTIN WHITSON, | ) | |
| | ) | Case No. 1:16-cv-9 |
| *Plaintiff*, | ) | |
| | ) | Judge Travis R. McDonough |
| v. | ) | |
| | ) | Magistrate Judge Christopher H. Steger |
| STATE OF TENNESSEE, d/b/a THE | ) | |
| UNIVERSITY OF TENNESSEE, | ) | |
| | ) | |
| *Defendant*. | ) | |

---

**MEMORANDUM OPINION**

---

Before the Court is Defendant State of Tennessee's motion for summary judgment (Doc. 34). For the reasons stated herein, the Court will **GRANT IN PART** and **DENY IN PART** the State of Tennessee's motion for summary judgment.

## I.    BACKGROUND[1]

Dr. Kristin Whitson received her Ph.D. from Vanderbilt University in 2003. (Doc. 46, at 1.) In 2007, the University of Tennessee at Chattanooga ("UTC")—a university within the state university system of Tennessee—hired Dr. Whitson as a non-tenure track lecturer in physics. (Doc. 24, at 2.) In 2009, UTC promoted her to a tenure-track Assistant Professor of Physics. (*Id.*) In addition to teaching classes, Dr. Whitson's primary research focused on the study of

---

[1] While many of these facts are disputed, the Court views the evidence in the light most favorable to Dr. Whitson and draws all reasonable inferences in her favor in considering summary judgment. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

odorant binding proteins ("OBP")—a field she began studying while on a post-doctoral research team at Vanderbilt. (Doc. 46, at 4.)

Early in her career at UTC, Dr. Whitson received a grant to pursue OBP research. (*Id.*) Initially, Dr. Whitson traveled from Chattanooga to Vanderbilt in Nashville to access certain necessary equipment that was unavailable to her at UTC. (*Id.*; Doc. 44, at 7.) However, in 2012, she began collaborating on her OBP research with Dr. Manuel Santiago[2], Dr. Stefanie Whitson[3], Dr. Jim Tumlin, Dr. Nicky Ozbek, and Dr. Jose Barbosa[4]. (Doc. 45-6, at 4–7.) In the summer of 2012, Dr. Whitson worked with Dr. Santiago in his chemistry lab. (Doc. 46, at 4.)[5] However, in the fall of 2012, Dr. Whitson had trouble accessing Dr. Santiago's chemistry lab because classes had resumed. (*Id.*) Because of this, Dr. Santiago suggested that Dr. Whitson also use Dr. Barbosa's lab for her research. (*Id.*) Dr. Barbosa agreed, but he would not allow Dr. Whitson to use the lab unless he was present. (*Id.*)

According to Dr. Whitson, her arrangement with Dr. Barbosa was initially "very advantageous" because Dr. Barbosa had equipment she needed for her research. (*Id.*) However, during the course of their collaboration, Dr. Barbosa did things that made Dr. Whitson uncomfortable, such as standing too close to her, suggesting that they hug when an experiment produced positive results, staring at her chest when talking to her, confiding in her about marital

---

[2] A Professor of Chemistry at UTC.

[3] Also a professor at UTC and the plaintiff's sister. Unless otherwise indicated, all references to "Dr. Whitson" are to Dr. Kristin Whitson, the plaintiff.

[4] An Assistant Professor of Biology, Geology, and Environmental Science at UTC.

[5] Although Dr. Whitson regularly references "collaborating" with Dr. Santiago and Dr. Barbosa, her filings do not make clear the extent of those collaborations.

problems, questioning her about her relationship with Dr. Santiago, and touching her uncomfortably on the shoulders. (*Id.* at 5.)

On October 20, 2012, Dr. Barbosa attempted to force himself upon her, temporarily blocking her exit from a room with his body while trying to grope her breasts and trying to hug and kiss her. (Doc. 24, at 3; Doc. 46, at 5–6.) After the incident, Dr. Whitson and her sister— also a professor at UTC—told Dr. Santiago about Dr. Barbosa's unwelcome advances. (Doc. 46, at 6.) Dr. Santiago told her that if she felt something wrong had happened, she should call the police. (Doc. 44, at 10.) According to Dr. Whitson, after she told Dr. Santiago about the incident with Dr. Barbosa, Dr. Santiago began distancing himself from her by imposing tighter controls on access to his lab and generally acting as though he no longer wanted to be alone with her. (Doc. 46, at 6.)[6] Then, in March of 2013, Dr. Santiago denied Dr. Whitson access to his lab altogether, forbade her from speaking to him, and required her to remove her research materials from the lab in front of students and colleagues. (*Id.* at 6–7.) As a result of Dr. Santiago's actions, Dr. Whitson began working with Dr. Barbosa and using his lab again. (*Id.* at 7.)

In April 2013, Dr. Whitson was in Dr. Barbosa's office discussing scheduling of experiments when Dr. Barbosa's wife arrived. (*Id.*) According to Dr. Whitson, upon seeing her, Mrs. Barbosa threw an object at Dr. Barbosa, screamed at him in a foreign language, and left the room abruptly while slamming the door. (*Id.*) Thereafter, Mrs. Barbosa sent Dr. Whitson a series of text messages directing her to stay away from her husband and questioning Dr.

---

[6] Although the timing of these events is unclear from the evidence presented to the Court, Dr. Whitson avers that at some point in time, Dr. Santiago referred to her and her sister as his "mistresses," commented on how good she looked in a pair of blue jeans, "grabbed [her] butt," and came up behind her and demonstrated how he had killed someone by slitting their throat when he was in the Army. (Doc. 46, at 6.)

Whitson's intentions. (*Id.*) Additionally, in May 2013, Dr. Whitson avers that while meeting with Dr. Barbosa in his office, he instructed her "stop sticking your breasts out at me." (*Id.*)

Later, Dr. Barbosa informed Dr. Whitson that the group of collaborators had asked him if he could replicate Dr. Whitson's OBP research. Dr. Barbosa refused the group's request, but Dr. Whitson asserts that this was an attempt to cut her out of the collaboration on her OBP research. (*Id.*) Shortly after Dr. Barbosa refused the request, Dr. Santiago allowed Dr. Whitson back into his lab and informed her that the group's OBP research would continue on a collaborative basis. (*Id.*) In the fall of 2013, however, Dr. Santiago told Dr. Whitson that he would not permit her access to her research data[7] and informed her that he "will be using [the OBP project data] for a paper I am working on." (*Id.*; Doc. 45-20, at 3.) Dr. Whitson protested Dr. Santiago's use of the research to Dr. Tom Rybolt, head of the chemistry department. (Doc. 46, at 8.) On December 9, 2013, Dr. Santiago wrote a letter to Dr. Habte Churnet—head of the Physics, Geology, and Astronomy Department at UTC—stating that he did not want anyone to author a paper about experiments performed and research conducted in his lab between May and July 2012. Eventually, Dr. Santiago returned Dr. Whitson's OBP research data to her. (*Id.*)

In addition to Dr. Barbosa's and Dr. Santiago's actions, Dr. Whitson avers that she experienced unpleasant interactions with two other UTC faculty members, Dr. Ling-Jun Wang and Dr. Churnet. According to Dr. Whitson, Dr. Wang placed his hand on her inner thigh when she visited his office in 2009 and then, in the spring of 2016, she overheard him through the wall in her office having a conversation with another person about sex, sexual harassment, and

---

[7] It is unclear how Dr. Santiago came into sole possession of the research notebook. However, the evidence suggests this occurred during the period Dr. Santiago was restricting Dr. Whitson's use of his laboratory.

women.  (*Id.* at 2.)  Additionally, Dr. Whitson avers that Dr. Churnet made several derogatory comments aimed at women generally between 2009 and 2014.  (*Id.* at 3.)

In December 2013, Dr. Whitson complained about the sexual harassment and research-related issues to Dean Jeff Elwell—Dean of the College of Arts and Sciences at UTC.  (Doc. 24, at 4.)  Given the nature of her complaints, Dean Elwell advised Dr. Whitson to file two separate internal complaints—one with the Office of Equity and Diversity ("OED") and one with the Office of Research Integrity ("ORI").  (*Id.*; Doc. 46, at 8.)  Dean Elwell advised Dr. Whitson that he would "stay out of" the issues related to her complaints of sexual harassment and research theft because he would ultimately decide whether she would be awarded tenure.  (Doc. 46, at 8.)

In January 2014, Dr. Whitson filed complaints with the OED and the ORI.  (Doc. 24, at 4.)  Around the same time, Dr. Whitson avers that Dr. Santiago complained to Dean Elwell about her.  (Doc. 45-1, at 48.)  Dr. Whitson further avers that, unlike the approach to her complaints, Dean Elwell handled Dr. Santiago's complaint personally without referring him to the OED or ORI (*id.*) and invited him to meet to discuss the "unwanted situation" in which he found himself (Doc. 45-23, at 2).

In the spring of 2014, the OED and the ORI informed Dr. Whitson that her complaints could not be proven conclusively, and they concluded their investigations.  (Doc. 46, at 9.)  Dr. Whitson avers that she never received any detailed reports of the OED's findings even though the OED directed Dean Elwell to provide her its results.  (*Id.*)

On March 21, 2014, Dean Elwell emailed Dr. Whitson a copy of her Evaluation and Development by Objectives report ("EDO") for the 2013-2014 year.  (Doc. 46, at 9.)  In the EDO, Dean Elwell noted that Dr. Whitson had a very productive year in terms of teaching, advising, and professional service but failed to publish a journal article.  (Doc. 46-2, at 4.)  In the

EDO, Dean Elwell wrote that he could not "emphasize enough" the need to publish journal articles in the coming year. (*Id.*) Additionally, Dean Elwell handwrote that, even though her excellent teaching and service outweighed an absence of research productivity for that year, his judgment would differ the next year if she made "similar efforts." (Doc. 46, at 9; Doc. 46-2, at 5.) After receiving Dean Elwell's comments on her EDO, Dr. Whitson asked him what he meant by the phrase "similar efforts," but she received no response. (Doc. 46, at 9.) After receiving no response from Dean Elwell, Dr. Whitson contacted Provost A. Jerald Ainsworth to notify him that she believed Dean Elwell was retaliating against her for her complaints about Drs. Barbosa and Santiago. (*Id.*) According to Dr. Whitson, Provost Ainsworth responded by telling her that she should think about finding a different job. (*Id.*)

In October 2014, Dr. Whitson published a paper in a journal entitled *Biochemistry and Analytical Biochemistry*, (Doc. 34-75, at 2–8), and then, in the spring of 2015, Dr. Whitson applied for tenure and promotion. (Doc. 24, at 5–6.) According to UTC's Faculty Handbook (the "Handbook"), tenure is awarded after a thorough review and in acknowledgment of a reasonable presumption of a faculty member's professional excellence and likelihood to continue to "contribute substantially to the mission and anticipated needs of the academic department in which tenure is granted." (Doc. 34-37, at 17.) "Professional excellence is reflected in the faculty member's teaching, research, and service, including the faculty member's ability to interact appropriately with colleagues and students." (*Id.*) The bylaws for the Department of Physics, Astronomy, and Geology at UTC provide that demonstrated excellence in teaching and advising is evidenced, in part, by: (i) a "[s]tatement of teaching philosophy consistent with the University[;]" (ii) "[e]stablishing a productive research program" which includes "publication of articles or book chapters in peer reviewed professional, regional, national, and/or international

journalists based on research undertaken while at UTC[;]" and (iii) a "[d]emonstrated service to the profession and the university." (Docs. 34-38, 34-39.)

The Handbook further specifies the process for awarding tenue. Specifically, the Handbook provides that "[n]o person shall acquire or be granted tenure except by positive action of the Board of Trustees upon the recommendation of the President." (Doc. 34-37, at 18.) The process further includes: (1) an advisory vote by tenured faculty members, which is then submitted to the department head; (2) the department head's independent review and recommendation to the dean; (3) the dean's independent review and recommendation to the Provost; (4) the Provost's independent recommendation to the Chancellor; and (5) the requirement that the Chancellor forward "only positive recommendations to the System President." (*Id.*) Additionally, the Handbook specifies the process for appealing a negative recommendation: if a resolution of a complaint is not achieved, any faculty member "may request review at successively higher administrative levels through the dean/director, Provost, Chancellor, and President." (Doc. 34-51, at 3.) Further, the Handbook provides that faculty or administrators may appeal "grievances," including tenure decisions, through the Faculty Administration Relations Committee ("FARC"), which operates in an advisory capacity only. (*Id.* at 3–4.)

In connection with her application for tenure and promotion, Dr. Whitson submitted her dossier and materials to the Rank and Tenure Committee, which consisted of five tenured faculty members who unanimously recommended that UTC grant Dr. Whitson's tenure and promotion.[10] Thereafter, Dr. Whitson's department head, Dr. Churnet, also recommended that UTC grant Dr.

---

[10] Dr. Wang was also on the Rank and Tenure Committee but abstained from Dr. Whitson's tenure vote. (Doc. 46, at 2.)

Whitson tenure and promotion. (*Id.*) However, on March 23, 2015, Dean Elwell recommended denial of Dr. Whitson's tenure and promotion. (Doc. 45-41, at 2.) Dean Elwell wrote that he could not concur with the recommendations of the Rank and Tenure Committee and Dr. Churnet because it appeared that Dr. Whitson's "record of peer-review publications and funded research falls short of what has been achieved by previous candidates for tenure in the department." (*Id.* at 2.)[11] On March 27, 2015, and April 7, 2015, respectively, Provost Ainsworth and Chancellor Steven R. Angle also found that they could not concur with the recommendations of the Rank and Tenure Committee and Dr. Churnet, and denied Dr. Whitson tenure and promotion. (Doc. 34-47, at 2; Doc. 34-49, at 2.)

Dr. Whitson appealed the tenure and promotion decision to Provost Ainsworth, citing sexual harassment, research theft, and unfair comparisons to other faculty members as justifications for a reversal of the tenure decision. (Doc. 34-56, at 2–4.) On May 7, 2015, Provost Ainsworth denied her appeal. (*Id.*) Dr. Whitson then appealed the denial to the FARC and to Chancellor Angle. (Doc. 24, at 5; Doc. 45-46, at 2.) The FARC conducted an investigation into Dr. Whitson's denial of tenure, and, on August 28, 2015, recommended that the decisions denying tenure be reconsidered. (Doc. 24, at 5; Doc. 45-46, at 2.)[12]

---

[11] Dean Elwell testified that he compared Dr. Whitson's application to Dr. Josh Hamblen, a particle physicist who was also up for tenure at the time, and Drs. Marlowe, Allen, and Wang— all of which had already been granted tenure in the Physics Department. (Doc. 45-2, at 45–46.) Dr. Whitson avers that Dr. Hamblen's research activity is not comparable to her own because Dr. Hamblen is part of a large research team at the Oak Ridge National Laboratory and receives author credit, along with all other members of the research team, whenever there is a publication concerning an experiment at this facility. (Doc. 45-1, at 8.)

[12] As the basis for its reconsideration recommendation, the FARC found that: (1) it could not find supporting and corroborating documentation for Dean Elwell's recommendation; (2) Dr. Hamblen was an "apples and oranges" comparison because the nature of his research led to any co-authored publications with as many as one hundred authors and because he himself had never published a paper as the sole author; (3) the Provost's reason for denying tenure was

Despite the FARC recommendation, Chancellor Angle denied Dr. Whitson's appeal for tenure and promotion. (Doc. 24, at 6; Doc. 34-62, at 2.) Because she did not receive tenure, Dr. Whitson's contract with UTC was not renewed following the conclusion of the Spring 2016 semester. (Doc. 24, at 6.) On October 1, 2015, Dr. Whitson filed a charge of discrimination with the Equal Employment Opportunity Commission. (Doc. 34-64, at 2; Doc. 34-129, at 2–3.)

Dr. Whitson initiated the present action on January 19, 2016. (Doc. 1.) Based on the allegations in her complaint, she asserts claims for hostile work environment, gender discrimination, and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 1981, *et seq.* and hostile educational environment, gender discrimination, and retaliation in violation of Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681, *et seq.* The State of Tennessee has moved for summary judgment on all of Dr. Whitson's claims. (Doc. 34.)

## II. STANDARD OF REVIEW

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court views the evidence in the light most favorable to the nonmoving party and makes all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis Inc*.,

---

unsubstantiated; (4) the specific research standard that had been articulated to Dr. Whitson had been met; and (5) a department bylaw change ten months prior to Dr. Whitson's application for tenure was unfairly applied. (Doc. 34-60, at 2–7.) Additionally, Dr. Marcia Noe, Chair of the FARC, testified that she personally felt Dr. Whitson "should have received tenure because she met the standards for tenure under the bylaws of the department under which she came in when she came to the university in 2009" and because multiple faculty members testified that the standard for tenure had previously been "60 percent teaching, 30 percent research, [and] 10 percent service." (Doc. 45-36, at 5.)

253 F.3d 900, 907 (6th Cir. 2001).

The moving party bears the burden of demonstrating that there is no genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003). The moving party may meet this burden either by affirmatively producing evidence establishing that there is no genuine issue of material fact or by pointing out the absence of support in the record for the nonmoving party's case. *Celotex Corp.*, 477 U.S. at 325. Once the movant has discharged this burden, the nonmoving party can no longer rest upon the allegations in the pleadings; rather, it must point to specific facts supported by evidence in the record demonstrating that there is a genuine issue for trial. *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002).

At summary judgment, the Court may not weigh the evidence; its role is limited to determining whether the record contains sufficient evidence from which a jury could reasonably find for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). A mere scintilla of evidence is not enough; the Court must determine whether a fair-minded jury could return a verdict in favor of the non-movant based on the record. *Id.* at 251–52; *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994). If not, the Court must grant summary judgment. *Celotex*, 477 U.S. at 323.

III.    **ANALYSIS**

Dr. Whitson argues the State of Tennessee discriminated against her in violation of Title VII and Title IX. (Doc. 24.) Title VII's anti-discrimination provision makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The anti-retaliation

provision of Title VII prohibits an employer from retaliating against an employee "because [s]he has opposed any . . . unlawful employment practice." 42 U.S.C. § 2000e-3. Section 901(a) of Title IX of the Education Amendments prohibits sex discrimination in "any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

### A.     Hostile Work Environment Under Title VII

Dr. Whitson asserts a Title VII claim for a hostile work environment based on sexual harassment against the State of Tennessee. A hostile work environment occurs when the "workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 733 (6th Cir. 2006) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). To prevail on a Title VII hostile work environment claim based on sexual harassment, a plaintiff must show that: "(1) he or she was a member of a protected class; (2) he or she was subjected to unwelcome sexual harassment; (3) the harassment complained of was based on sex; (4) the charged sexual harassment created a hostile work environment; and (5) the employer is liable." *Smith v. Rock-Tenn Servs., Inc.*, 813 F.3d 298, 307 (6th Cir. 2016).

Before considering whether Dr. Whitson has demonstrated that a genuine issue of material fact remains regarding the elements necessary to establish a hostile work environment claim, the Court must first determine whether her hostile work environment claim is timely. Under Title VII, an administrative charge must be filed with the EEOC within "300 days *after* the unlawful practice happened." 42 U.S.C. § 2000e-5(e)(1) (emphasis added). The administrative charge period is the functional equivalent of a statute of limitations period. *Sharpe v. Cureton*, 319 F.3d 259, 268 (6th Cir. 2003) (citing *Zipes v. Trans World Airlines, Inc.*,

455 U.S. 385, 393–95 (1982)); *see also Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 110 (2002). What constitutes an "unlawful employment practice" for the purposes of the administrative charge period depends on the practice itself; it can be a discrete retaliatory or discriminatory act or can involve repeated conduct. *Morgan*, 536 U.S. at 110. Because hostile work environment claims involve repeated conduct, they are distinct from discrete retaliatory or discriminatory acts in that they are "composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'" *Id.* at 117. Therefore, "a court's task is to determine whether the acts about which an employee complains are part of the same actionable hostile work environment practice, and if so, whether any act falls within the statutory time period." *Id.* at 120.

The parties largely focus their arguments on the applicability of the continuing violations doctrine. (Doc. 44, at 25–26; Doc. 47, at 24–25.) This is an equitable doctrine that provides that violations "which occur beyond the limitations period are actionable where a plaintiff challenges not just one incident of unlawful conduct but an unlawful practice that continues into the limitations period." *Haithcock v. Frank*, 958 F.2d 671, 677 (6th Cir. 1992) (internal quotation marks and alterations omitted); *see also Austion v. City of Clarksville*, 244 F. App'x 639, 647 (6th Cir. 2007). Historically, there were two categories of continuing violations, serial and systemic. However, *Morgan* "effectively eliminated the serial continuing-violation doctrine when it held that 'discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Slorp v. Lerner, Sampson, & Rothfuss*, 587 F. App'x 249, 257 (6th Cir. 2014). Thus, when a plaintiff alleges a prior discriminatory act that continues into the present, such as in a hostile work environment claim, the continuing violations doctrine may apply. Ultimately, a "hostile work environment claim . . . will not be time barred

so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period." *Morgan*, 536 U.S. at 122.

Because Dr. Whitson filed her charge of discrimination with the EEOC on October 5, 2015, her claim is only timely if some act contributing to the same actionable hostile work environment occurred after December 9, 2014. (Doc. 44, at 25–26; Doc. 34-110, at 11; Doc. 34-129, at 2–3.) In support of her argument that her hostile work environment claim is timely, Dr. Whitson argues that Dr. Barbosa's sexual comments and touching, Dr. Santiago's "reaction and exclusion," UTC's treatment of her complaints, Dean Elwell's negative and vague comments on her EDO, Dean Elwell assisting Dr. Santiago's complaint while "splintering" her complaints, and her being denied tenure all contributed to her hostile work environment. (Doc. 44, at 25–27.) Dr. Whitson thereby argues that, because she was denied tenure and overhead Dr. Wang have a conversation about sex after December 5, 2014, her hostile work environment claim is timely. (*Id.*)

Dr. Whitson's argument fails. Despite trying to connect all events negatively affecting her, Dr. Whitson's hostile work environment claim based on sexual harassment is founded on Dr. Barbosa's attempt to grope and force himself on her in 2012 and Mrs. Barbosa's threatening text messages in early 2013. (*See, e.g.*, Doc. 24, at 7 (asserting "she was subjected to sexual harassment" as the basis for her hostile work environment claim); *see also* Doc. 44, at 24 (arguing the *prima facie* case to establish her hostile work environment claim is premised on sexual harassment from coworkers).) With the exception of overhearing Dr. Wang have a conversation regarding sex in his office in 2016, all of these events underlying her hostile work environment claim occurred outside the administrative charge period. Even if Dr. Wang inappropriately touched Dr. Whitson in 2009, a conversation unrelated to her and not directed

toward her seven years later on the other side of a wall does not qualify as an act contributing to the same hostile environment. *See Bowman v. Shawnee State Univ.*, 220 F.3d 456, 463 (6th Cir. 2000) (noting that a plaintiff must show that the actionable conduct was "severe or pervasive enough to create an environment" that was both subjectively and objectively "hostile or abusive").

Additionally, other events, such as Dr. Whitson's denial of tenure, are not sufficiently intertwined with the underlying sexual harassment in order to render her hostile work environment claim timely. The acts on which Dr. Whitson relies either do not constitute part of the same unlawful employment practice or are discrete discriminatory acts that serve as the basis for their own claims. For instance, Dr. Whitson alleges UTC's treatment of her complaints, Dr. Santiago's "reaction" to Dr. Barbosa's advances and his subsequent "exclusion" of her from the research labs, Dean Elwell's comments on her EDO, and her denial of tenure all constitute part of the same hostile work environment. (Doc. 44, at 25–26.) However, these acts are not the sort of discriminatory intimidation, ridicule, or insult that constitutes the kind of gender-based sexual harassment actionable under a hostile work environment claim. *See Harris*, 510 U.S. at 21 (providing that workplaces "permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment" violate Title VII). Moreover, some of these acts—such as being denied tenure—are discrete retaliatory or discriminatory acts that are actionable in their own right under Title VII, as evidenced by Dr. Whitson's standalone claims for retaliation and discrimination. *See Morgan*, 536 U.S. at 118. Because only discrete discriminatory acts occurred during the administrative charge period—and not acts evidencing the same hostile work environment employment practices that occurred

before the administrative charge period, the Court will **GRANT** the State of Tennessee's motion for summary judgment on Dr. Whitson's hostile work environment claim under Title VII.[14]

### B.    Hostile Educational Environment Under Title IX

Dr. Whitson asserts a Title IX claim for a hostile educational environment against the State of Tennessee.[15]  Title IX specifically provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any educational program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).  For the purposes of Title IX, "program or activity" is defined as "all the operations of . . . a college, university, or other postsecondary institution."  20 U.S.C. § 1687.

Although Title IX claims for sexually hostile environment under Title IX have no direct link to hostile work environment claims made under Title VII, courts rely on Title VII law to

---

[14] Even if Dr. Whitson's Title VII claim for a hostile work environment were timely, the claim would nonetheless fail.  "To establish employer liability where the harasser is a co-worker, a plaintiff must show that the employer knew or should have known of the conduct and failed to take prompt and appropriate corrective action."  *Smith*, 813 F.3d at 307.  Dr. Whitson contends that the State of Tennessee had notice of the harassment she suffered and failed to take prompt and appropriate action.  (Doc. 44, at 26–27.)  However, even taken in the light most favorable to Dr. Whitson, the evidence fails to show that the State of Tennessee, by way of the administrators at UTC, failed to take prompt or appropriate corrective action when they learned of Dr. Whitson's allegations.  In fact, the evidence suggests that Dean Elwell promptly advised Dr. Whitson to proceed through the University's internal complaint processes with the OED and the ORI.  In time, both of those committees determined that they could not conclusively find in Dr. Whitson's favor.  This does not establish a failure by the employer to take prompt and appropriate action.

[15] Because UTC is an institution in the state of Tennessee's university system, which receives federal funding, UTC has waived its Eleventh Amendment immunity for Title IX purposes pursuant to 42 U.S.C. § 2000d-7.

analyze Title IX hostile environment claims.[16]  In order to proceed on a Title IX claim against an educational institution, a plaintiff must show that:  (1) "she was subjected to *quid pro quo* sexual harassment or a sexually hostile environment;" (2) "she provided actual notice of the situation to an 'appropriate person,' who was, at a minimum, an official of the of the educational entity with authority to take corrective action and to end discrimination; and" (3) "the institution's response to the harassment amounted to 'deliberate indifference.'"  *Klemencic v. Ohio State Univ.*, 253 F.3d 504, 510 (6th Cir. 2001).

Although Title IX does not contain its own statute of limitations, the Sixth Circuit has held that the statute of limitations for Title IX claims is the state's personal injury limitations period, which is one year in Tennessee.  *Lillard v. Shelby Bd. of Educ.*, 76 F.3d 716, 728–29 (6th Cir. 1996).  Dr. Whitson initiated the present action on January 19, 2016.  (Doc. 1.)  In order for her Title IX hostile educational environment claim to be timely, some act contributing to the sexually hostile environment must have occurred after January 19, 2015.

Dr. Whitson has provided no additional evidence or argument beyond that which she offered in defense of her hostile work environment claim—that events such as her denial of tenure were intertwined with her claim.  This argument also fails to make her Title IX claim timely.  As discussed above[17], discrete discriminatory acts, such as the denial of tenure, that are actionable under their own claims did not contribute to the same actionable hostile educational

---

[16] *See Franklin v. Gwinnett Cty. Pub. Schs.*, 503 U.S. 60, 73–76 (1992) ("Unquestionably, Title IX placed on the [school system] the duty not to discriminate on the basis of sex, and when a supervisor sexually harasses a subordinate because of the subordinate's sex, that supervisor discriminates on the basis of sex.  We believe the same rule should apply when a teacher sexually harasses and abuses a student.") (internal quotations and alterations omitted); *see also Johnson v. Galen Health Insts., Inc.*, 267 F. Supp. 2d 679, 687 n.5 (W.D. Ky. June 16, 2003).

[17] *See supra* Part III(A).

environment, even if they occurred during the limitations period. *See Morgan*, 536 U.S. at 118.

None of the acts supporting Dr. Whitson's hostile educational environment claim occurred

within the limitations period. Accordingly, the Court will **GRANT** the State of Tennessee's

motion for summary judgment on Dr. Whitson's Title IX claim for hostile educational

environment based on sexual harassment.

### C. Gender Discrimination and Retaliation Claims[19]

#### i. Internal Appeals Process

The State of Tennessee first argues that Dr. Whitson's Title VII discrimination and

retaliation claims fail because she did not appeal the tenure and promotion decision to the

President of the university, thereby failing to complete the internal appeals process.[20] (Doc. 35,

at 22.) Gender discrimination claims and retaliation claims under Title VII both require that a

plaintiff suffer an adverse employment action. *See Ondricko v. MGM Grand Detroit, LLC*, 689

F.3d 642, 653 (6th Cir. 2012) (providing the *prima facie* case for a gender discrimination claim

under Title VII); *see also Abbott v. Crown Motor Co., Inc.*, 348 F.3d 537, 542 (6th Cir. 2003)

(providing the *prima facie* case for a retaliation claim under Title VII). A denial of tenure does

---

[19] The Court acknowledges that whether Dr. Whitson's Title IX claims are preempted by Title VII is an unanswered question in the Sixth Circuit. *See, e.g.*, *Arceneaux v. Vanderbilt Univ.*, 25 Fed. App'x 345 (6th Cir. 2001); *see also Weaver v. Ohio St. Univ.*, 194 F.3d 1315 (table) (6th Cir. 1999).

[20] Throughout the briefings, the State of Tennessee refers to Dr. Whitson's "tenure and promotion claims." (*See, e.g.*, Doc. 35, at 22.) While this may be an attempt to head off Dr. Whitson from asserting discrimination claims that may not be easily evident from the complaint, her complaint identifies only claims for hostile educational/work environment, gender discrimination, and retaliation. (Doc. 24, at 2.) Therefore, because the denial of "tenure and promotion" pertains specifically to a common element of the gender discrimination and retaliation claims—that being suffering an adverse employment action—the Court interprets the State of Tennessee's reference to "tenure and promotion claims" as pertaining only to those claims.

not qualify as an adverse employment action unless it qualifies as an "ultimate employment decision" which, in the context of tenure decisions, often requires completion of an internal appeals process that precedes a final decision. *See Benison v. Ross*, 765 F.3d 649, 659 (6th Cir. 2014); *see also Dobbs-Weinstein v. Vanderbilt Univ.*, 185 F.3d 542, 545 (6th Cir. 1999) ("Because tenure decisions are so complex and potentially contentious, universities are well-served to have a grievance procedure for individuals wishing to appeal any of the many intermediate decisions or evaluations made during the tenure review process.").

The State of Tennessee argues that because Dr. Whitson did not appeal the denial of her tenure and promotion all the way to the President, she failed to complete the internal appeals procedure and her "tenure and promotion claims" should be dismissed. While the UTC Faculty Handbook clearly provides that a grant of tenure can only come from the Board of Trustees by way of a positive recommendation from the University President, the handbook fails to explicitly provide a process one *must* pursue in the event of a denial of tenure. (*See* Doc. 34-37, at 18; *see also* Doc. 34-51, at 3–4.) Rather, the handbook provides only a suggestive, progressive appeals process and an avenue for review through the FARC that is purely advisory. (*See* Doc. 34-51, at 3 ("If resolution of the problem is not achieved, the faculty member *may* request review at successively higher administrative levels . . . ."))

In this case, Dr. Whitson engaged in an appeals process with the Provost, the FARC, and the Chancellor after being denied tenure. (*See* Doc. 34-56; Doc. 45-46.) Because the Faculty Handbook's appeals process includes suggestive, but not mandatory, language, Dr. Whitson's actions appealing the denial of her tenure are sufficient to create a genuine issue of material fact as to whether the denial of her tenure constitutes an "ultimate employment decision," and, thus, whether she suffered an adverse employment action.

### ii. Gender Discrimination

Dr. Whitson asserts claims for gender discrimination under Title VII and Title IX. "Because Title IX does not provide an analytical framework for claims of gender discrimination by an educational institution, most circuits, including ours, have applied the *McDonnell Douglas* burden-shifting framework used in analyzing discrimination claims arising under Title VII." *Arceneaux v. Vanderbilt Univ.*, 25 F. App'x 345, 347 (6th Cir. 2001); *see also McDonnell Douglas v. Green,* 411 U.S. 792, 802 (1972). To establish a *prima facie* case for gender discrimination under Title VII, a plaintiff must show that: (1) she is a member of a protected class; (2) she was qualified for the job and satisfactorily performed it; (3) she suffered an adverse employment action; and (4) others, similarly situated and outside the protected class, were treated differently. *Ondricko*, 689 F.3d at 653. Once the *prima facie* case is established, "the burden shifts to the defendant to offer evidence of a legitimate, non-discriminatory reason for the adverse employment action." *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir. 2008). If the defendant meets that burden, "the burden shifts back to the plaintiff to show that the defendant's proffered reason was not its true reason, but [was] merely a pretext for discrimination." *Id.* at 391–92. "[A] plaintiff can show pretext in three interrelated ways: (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action." *Romans v. Mich. Dep't of Human Servs.*, 668 F.3d 826, 839 (6th Cir. 2012) (quoting *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009)).

The State of Tennessee first argues that Dr. Whitson's gender discrimination claim fails because she did not identify Chancellor Angle in her discovery responses when she was asked to identify anyone who discriminated against her on the basis of gender. (*Id.* at 32.) The State of

Tennessee argues that because Chancellor Angle is the ultimate decision maker with regard to her tenure application, and because she failed to identify him as discriminating against her, she has failed to demonstrate that a genuine issue of material fact remains . (*Id.*)

Dr. Whitson has created a genuine issue of material fact as to whether Chancellor Angle made the decision regarding her tenure and promotion. For instance, while Chancellor Angle testified that he performed an independent review of Dr. Whitson's tenure application (Doc. 34-2, at 4), Dean Elwell testified that Chancellor Angle had never disagreed with him on a tenure recommendation (Doc. 45-2, at 10). Further, Provost Ainsworth also testified that he could not recall a time when he disagreed with Dean Elwell's recommendation. (Doc. 45-44, at 3–4.) Moreover, Dr. Whitson averred that when she complained to Dean Elwell about sexual harassment and research theft, he told her he would stay out of those issues because "he was the one who would be deciding whether I would be awarded tenure." (Doc. 46, at 8.) Accordingly, Dr. Whitson has met her burden at the *prima facie* stage.

Having met her burden at the *prima facie* stage, the burden shifts to the State of Tennessee to provide a legitimate, non-discriminatory reason for denying her tenure and promotion. In this case, the State of Tennessee has proffered a legitimate, non-discriminatory reason for the denial of tenure and promotion—specifically, that Dr. Whitson failed to publish a sufficient amount of research. Thus, the burden shifts back to Dr. Whitson to establish that the University's denial of tenure was pretextual.

In this case, Dr. Whitson has created a genuine issue of material fact with regard to whether the State of Tennessee's legitimate, non-discriminatory reason for denying her tenure and promotion was pretext for gender discrimination. Dr. Whitson offered several pieces of evidence which, when viewed in the light most favorable to her, could demonstrate that her lack

of research either did not motivate or was insufficient to motivate denying her tenure and promotion. *See Tuttle v. Metro. Gov't of Nashville*, 474 F.3d 307, 319 (6th Cir. 2007). For instance, Dr. Whitson testified that when she voiced concerns about Dean Elwell's comments about her publishing on her EDO, Provost Ainsworth told her that she should think about finding a different job. (Doc. 46, at 9.) Moreover, Dr. Whitson introduced evidence that could suggest she was treated differently than her male counterparts. For example, although Dean Elwell remained distant with regard to her complaints of sexual harassment and research theft, he handled Dr. Santiago's complaints about her personally, without referring him to any University committee. (Doc. 46, at 8; Doc. 45-23, at 2; Doc. 45-24, at 2–7; Doc. 45-2, at 52.) Furthermore, Dr. Whitson averred that UTC's Human Resources Director indicated to her that Dean Elwell had personally instructed that her complaints *only* be handled by the OED and the ORI. (Doc. 46, at 9.) And, the FARC's independent investigation and recommendation found that the Dean and Provost lacked supporting documentation for their stated reasons to deny tenure and promotion and that Dr. Whitson was unfairly compared to Dr. Hamblen and judged under bylaws that were not in place during the majority of her time at UTC. (Doc. 34-60, at 2–7.) Taking the evidence in the light most favorable to Dr. Whitson, the Court finds that a reasonable juror could conclude that Dr. Whitson's research publication record did not actually motivate or was insufficient to motivate the decision to deny her tenure and promotion. As such, a reasonable juror could conclude that the legitimate, non-discriminatory reason offered by the State of Tennessee was pretext for gender discrimination. Accordingly, the Court will **DENY** Defendant's motion for summary judgment on Dr. Whitson's claims for gender discrimination under Title VII and Title IX.

### iii. Retaliation

Dr. Whitson asserts claims of retaliation under Title VII and Title IX. The *McDonnell Douglas* burden-shifting framework applies to claims for retaliation made under both Title VII and Title IX. *Fuhr v. Hazel Park Sch. Dist.*, 710 F.3d 668, 673 (6th Cir. 2013); *see also Gordon v. Traverse City Area Pub. Schs.*, No. 16-1613, 2017 WL 1363890, at *4 (6th Cir. Apr. 12, 2017); *Doe v. Univ. of Tennessee*, 186 F. Supp. 3d 788, 809 (M.D. Tenn. May 3, 2016). To establish a *prima facie* case of retaliation under Title VII, Plaintiff must first establish that: (1) she engaged in protected activity; (2) that defendant knew that she engaged in this protected activity; (3) the defendant subsequently took an employment action adverse to the plaintiff; and (4) a causal connection between the protected activity and the adverse employment action exists. *Abbott*, 348 F.3d at 542. After establishing the *prima facie* case, "the burden shifts to the defendant to articulate a legitimate non-discriminatory reason for the adverse action." *Nguyen v. City of Cleveland*, 229 F.3d 559, 562 (6th Cir. 2000). If the defendant meets its burden, the plaintiff must then demonstrate that the proffered reason was mere pretext for retaliation. *Veluzat v. Williamson Med. Ctr.*, 627 F. App'x 534, 541 (6th Cir. 2015). Title VII claims must be proven under the traditional principles of but-for causation; namely, that a defendant would not have taken the adverse action had the plaintiff not engaged in her protected activity. *See Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2528, 2533 (2013).

The State of Tennessee does not dispute the first three elements of the *prima facie* case. However, the State of Tennessee argues that Dr. Whitson cannot meet her burden as to the fourth element of the *prima facie* case—that a causal connection exists between her protected activity

and an adverse employment action. (Doc. 35, at 30.) The evidence, however, is inconsistent with this position.

Dr. Whitson has introduced evidence that creates a genuine issues of material fact regarding the causal connection between her complaints of sexual harassment and research theft and her ultimate denial of tenure and promotion. Causation may be inferred from such factors as temporal proximity and differential treatment of similarly situated comparators. *Mitchell v. Per-Se Techs., Inc.*, 64 F. App'x 926, 927 (6th Cir. 2003) (*citing Nguyen*, 229 F.3d at 563). Although Dr. Whitson argues that her application for tenure and promotion was the first opportunity for retaliation, quite some time passed between Dr. Whitson's complaints to Dean Elwell in December 2013 and the denial of her application for tenure and promotion in 2015. This temporal distance does not suggest a causal connection. However, Dr. Whitson has presented evidence that could suggest she was treated differently than similarly situated employees. For instance, Dr. Whitson has presented evidence that although Dean Elwell advised her to file complaints with the OED and the ORI and told her he would stay out of those issues due to his role in determining her tenure later, Dean Elwell handled Dr. Santiago's concerns personally, without referring him to the University committees that handled internal faculty issues. Moreover, as discussed in the previous discussion, the FARC found that Dr. Whitson had been unfairly compared to Dr. Hamblen during the tenure process. Accordingly, Dr. Whitson has met her burden at the *prima facie* stage.

Having met her burden at the *prima facie* stage, the burden shifts to the State of Tennessee to provide a legitimate, non-discriminatory reason for denying her tenure and promotion. Once again, the State of Tennessee has proffered a legitimate, non-discriminatory reason for the denial of tenure and promotion: Dr. Whitson's failure to publish an adequate

amount of research.  Thus, the burden shifts back to Dr. Whitson to establish that the University's denial of tenure was pretextual.

Dr. Whitson has created a genuine issue of material fact regarding whether the State of Tennessee's legitimate, non-discriminatory reason for denying her application for tenure and promotion was pretext for retaliation.  Once again, Dr. Whitson has offered evidence that suggests that the State of Tennessee's legitimate, non-discriminatory reason for denying tenure and promotion either was not actually motivated by or was insufficient to explain the decision. For instance, Dr. Whitson has presented evidence that when she voiced her concerns regarding Dean Elwell's comments on her EDO being potentially retaliatory for her complaints of sexual harassment and research theft, Provost Ainsworth suggested she think about looking for another job.  Furthermore, Dr. Whitson introduced evidence that an independent review conducted by the FARC found that Dean Elwell and Provost Ainsworth's decisions to deny her tenure and promotion were not supported by corroborating documentation, used unfair comparisons, and employed bylaws that had not been put in place during most of Dr. Whitson's employment. Moreover, Dr. Whitson testified that after she received Dean Elwell's handwritten comments on her EDO—on the same day the OED informed her that it could not consider all the elements of her complaint—she inquired of Dean Elwell about what the phrase "similar efforts" meant but received no response from him.  This evidence, taken in the light most favorable to Dr. Whitson, is sufficient to establish that a reasonable juror could find that the proffered reason was pretext for retaliation. Accordingly, the Court will **DENY** Defendant's motion for summary judgment on Dr. Whitson's claims for retaliation under Title VII and Title IX.

IV.     CONCLUSION

For the reasons discussed above, the State of Tennessee's motion for summary judgment (Doc. 34) is **GRANTED IN PART** and **DENIED IN PART**.  Dr. Whitson's claims for hostile work environment under Title VII and hostile educational environment under Title IX are time-barred and will be dismissed.  Dr. Whitson's claims under Title VII and Title IX for gender discrimination and retaliation will proceed to trial.

    **SO ORDERED.**

*/s/ Travis R. McDonough*
**TRAVIS R. MCDONOUGH**
**UNITED STATES DISTRICT JUDGE**